h GULOTTA, Judge Pro Tempore.
This is a personal injury lawsuit, directed by plaintiff, William Grieff,[1] a former employee of the Jefferson Parish Sheriffs Office, against Sheriff Harry Lee and the Parish of Jefferson, for injuries he sustained in a fall on the steps of the sheriffs *427 office building, during his employment. The trial judge, in a bifurcated trial, first rendered a judgment in the amount of $493,806.75 in favor of plaintiff and against both the Parish of Jefferson and Sheriff Harry Lee and then found both defendants liable. The Parish of Jefferson and the sheriff appeal.
The trial judge, in her judgment on the liability issue, concluded that the Parish of Jefferson is liable under La. Civ.Code art. 2322 as the owner of the building where the plaintiff was injured and that plaintiffs damages were caused 12by the “ruin” in the building resulting from “a neglect to repair and improper maintenance.” The trial judge further concluded on the sheriffs liability that the sheriff was liable for damages under La. Civ.Code art. 2315, “... due to his negligence in failing to properly maintain the steps.... ” The trial judge did not find the plaintiff comparatively at fault.
In the trial judge’s exhaustive reasons for judgment on damages, she stated that “[t]he un-contradicted post-accident emotional picture portrayed by the witness was one of emotional deterioration beginning upon Mr. Grieffs return to work in October 1993 and continuing to a total inability to function when Mr. Grieff began seeing Dr. Levine and ongoing at the time of trial.”
The trial judge further pointed out that Grieff never returned to work and never resumed his work at the sheriffs office subsequent to the October 1994 surgery. Additionally, she stated that, despite the sheriffs claim that plaintiff could have returned to sedentary positions with the sheriffs office post-surgery, plaintiffs mental and emotional condition, according to the experts, was such that plaintiff was not employable.
Appealing the trial court’s finding of liability, the sheriff claims that there was no evidence to show any alleged failure on the sheriffs part to maintain the steps in question or that the sheriff knew or should have known of any hazardous condition of the steps. Appealing damages, the sheriff claims that due to the undisputed testimony regarding plaintiffs pre-injury neck condition and subsequent accidents following his fall on the steps, the trial judge erred in finding the sheriff responsible for all of plaintiffs neck injuries based solely on the aggravation by the September 1993 step accident. The sheriff further contends that the trial judge erred in finding that the sole cause of plaintiffs psychiatric distress and psychiatric problem was the fall on the steps.
In an additional assignment of error, the sheriff complains there was no showing that plaintiff suffered any wage loss because of the September 1993 ^accident. Additionally, the sheriff complains that the trial judge seriously erred when she relied on the testimony of a social worker, who was not qualified and not able to make a medical diagnosis, in preference to a duly qualified psychologist who performed psychological testing on the plaintiff. Further, the sheriff complains that, because of the stipulation in the record stating that plaintiff received his full wages and benefits until his termination in March 1997, the trial judge erred by awarding $23,343.60 in previously paid medical bills. Finally, the sheriff contends that, because of the absence of evidence in the record to establish that plaintiff was unable to return to his job at the sheriffs office or similar work, the trial judge erred by awarding $2,700.00 for vocational rehabilitation.
The Parish of Jefferson, appealing on the liability issue, claims that, because the parish was only the title owner of the building and received no benefits in rent or otherwise, it was not the “de facto” owner of the building and could not be liable under La. Civ.Code art. 2322.[2] Also, on *428 the liability issue, the parish claims that the trial judge manifestly erred when it determined that the cracked tile was caused by neglect to repair.
Additionally, the parish asserts that the trial judge erred in its judgment on damages in determining that the sole cause of plaintiffs physical and mental injuries was the September 23, 1993 accident when plaintiffs cervical problems had pre-exist-ed the 1993 fall and plaintiffs cervical problems were further aggravated by three subsequent accidents. Further, the parish claims it is not liable for all of the emotional stresses in plaintiffs life. The parish also asserts that the trial judge erred in assessing liability to the parish for loss of wages attributed to injuries which plaintiff sustained in subsequent accidents. Also, the |4Parish of Jefferson claims the trial judge erred in assessing the full cost of plaintiffs future medical and psychological treatment to the parish despite intervening causes of plaintiffs medical condition. Finally, the parish claims the trial judge erred in finding the parish liable for vocational rehabilitation when plaintiff refuses to perform available jobs within his restricted medical capabilities.

LIABILITY

JEFFERSON PARISH

The Parish of Jefferson contends the trial court erred in finding it liable for this accident. The Parish asserts that while it did maintain “paper title” to this building, that alone is insufficient to hold it liable under La. Civ.Code art. 2322. According to the Parish, the only reason it held title to the building was because the sheriffs office could not own real property.[3] Article 2322 provided, before its 1996 revision: “The ovmer of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction.” “Owner” in this context is largely undefined by the jurisprudence. The Louisiana Supreme Court, in the landmark case of Loescher v. Parr, 324 So.2d 441 (La.1975), summarized the doctrine of strict liability under Articles 2322 and 2317. Under the caption “Summary of Principles of Legal Fault under Articles 2318, 2320, 2321 and 2322,” the supreme court stated:
When harm results from the conduct or defect of a person or thing which creates an unreasonable risk of harm to others, a person legally responsible under these code articles for the supervision, care, or guardianship of the person or thing may be held liable for the damage thus caused, despite the fact that no personal negligent act or inattention on the former’s part is proved. The liability arises from his legal relationship to the person or thing whose conduct or defect creates an unreasonable risk of injuries to others.
The fault of the person thus liable is based upon his |5failure to prevent the person or thing for whom he is responsible from causing such unreasonable risk of injury to others. Thus, the person to whom society allots the supervision, care, or guardianship (custody) of the risk-creating person or thing bears the loss resulting from creation of the risk, rather than some innocent third person *429 harmed as a consequence of his failure to prevent the risk. His fault rests upon his failure to prevent the risk-creating harm and upon his obligation to guard against the condition or activity (by the person or thing for which he is responsible), which creates the unreasonable risk of harm to others. [324 So.2d at 446.]
In Olsen v. Shell Oil Co., 365 So.2d 1285, 1288-1289 (La.1978), the supreme court expounded on its explanation in Loescher: “The owner’s fault (under Article 2322) is founded upon the breach of his obligation to maintain or repair his budding so as to avoid the creation of undue risk of injury to others.” (Explanation added.)
Although, generally, the title owner and the real or “de facto” owner are the same person or entity, and contemplated as the person responsible under Article 2322, in the instant case the parish is the owner in title only for convenience, and the sheriff, for all intent and purposes, is the real owner. The Parish and the sheriff stipulated that the sheriff conducted the negotiations for the acquisition of the building, the sheriff provided the funds for the purchase, the sheriff has always solely occupied the building, the sheriff has always borne full responsibility for the maintenance of the building, and the sheriff agreed at the time of purchase to pay for all insurance associated with the building. The sheriff, thus, had complete custody and control of the building. Thegarde of the premises rested solely and entirely ■with the sheriff. Loescher v. Parr, 324 So.2d at 441.
Furthermore, unlike the usual circumstances, such as a lessor/lessee arrangement, where the owner derives economic benefit from the ownership of the building, the parish received no rent and no benefit. All of the responsibilities, duties, and benefits rested with the sheriff and not with the parish. Based on the stipulatiqns, the fact that the sheriff was prohibited from holding title to real | (¡property when the parish acquired title to the property, and the fact that the parish never had another connection with the property after it acquired the title for the sheriff, we are led to conclude that the parish’s responsibility is not as contemplated under La. Civ.Code art. 2322. Accordingly, we hold that the parish is not liable to plaintiff for injuries sustained by him.[4]

JEFFERSON PARISH SHERIFF HARRY LEE

The trial judge found Sheriff Harry Lee liable under La. Civ.Code art. 2315. In doing so, the judge stated: “Further, this Court finds the Sheriff of Jefferson liable for damages previously set forth to the plaintiff under Civil Code Article 2315 due to its negligence in failing to properly maintain the steps on the front of 725 Maple St.” The court gave no other' reasons, written or oral, for finding the sheriff liable under Article 2315.
Of concern to this court on the question of the sheriffs liability is whether that liability, if it indeed exists, is based on La. Civ.Code art. 2315 negligence or La. Civ. Code art. 2317 strict liability.
Donald McGinnis, an architect, inspected the premises in September 1997, four years after the accident. Only one photograph demonstrates the condition of the steps shortly after the accident. That photograph shows the broken tile. McGinnis testified that the grout setting was uneven and in those instances, eventual breaks in the tile material will occur. McGinnis stated that there were numerous cracks and voids in the mortar joints where mortar had popped out. His observation of the condition of the mortar joints around the area where the tile broke was “very poor.” He concluded that these steps were poorly maintained. His testimony supported a *430 conclusion that a piece of the tile, 3x3 inches, broke off and contributed to plaintiffs accident.
^Although the steps were of a normal construction, according to McGinnis, he opined that a number of reasons might exist why there were cracks in the tile and mortar missing from the joints. He suggested that perhaps the mortar mix was watery or too weak and created some voids between the concrete and the tile, and with continual use, fractures and chips occur and some of the mortar joints “pop out” during continual use. This witness stated that this cracking of a tile “should not happen” and that the tile was “defective.” McGinnis further testified that, based on the fact that plaintiff stepped on the edge of the tile and it broke, the tile was in bad condition. He further added this was caused by bad maintenance.
With knowledge that a tile was missing in the past from a different area of the steps and replaced improperly, McGinnis concluded that it would have been foreseeable that a tile would crack or that there may have been some problems with the tile. He added further that a two-month period (when the photograph was taken by plaintiff) subsequent to the accident would not be any sufficient period where any amount of mortar would erode through rain or another element. Finally, McGin-nis testified that, in September 1997 when he took the photographs, he viewed numerous cracks, holes in the tile, missing mortar joints throughout the entire step and landing area. However, the witness acknowledged that he could not say whether these defects existed in the initial construction.
John Devlin was an employee of the Jefferson Parish Sheriffs Office narcotics divisipn for approximately 24 years, and worked at the address where his fellow officer, plaintiff, was injured. He left his employment there in September 1994, though he testified that he did not return to the sheriffs office building after January or February of 1993. According to Devlin, he observed problems with the tile in the area around the front door of the building. He testified about an incident in May of 1992, where he noticed that a tile was missing, and about a month or two later, he noticed that the tile had been |sreplaced, but “was not grouted in.” He also stated that he noticed that the tile moved when he stepped on it. He vaguely refers to the tile being loose six months before the incident about which he testified.
When analyzing the testimony or lack of testimony on the sheriffs liability, the question arises in one’s mind whether the showing of negligence on the part of the sheriff is established under La. Civ. Code art. 2315. Although the testimony of the architect and that of Devlin was uncon-tradicted and unrebutted, we cannot conclude that, merely because the tile broke, negligence on the part of the sheriffs office was established. Therefore, we do not find that the sheriffs office is liable under La. Civ.Code art. 2315.
However, it appears that the sheriffs liability comes within the ambit of La. Civ.Code art. 2317, which, as set forth prior to the most recent amendment in 1996, read as follows:
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications. (Emphasis added).
Because the sheriff had the complete responsibility for the custody, maintenance, repair, and upkeep of the premises and because plaintiffs injuries resulted from a broken tile on the property, we conclude that Sheriff Harry Lee is liable for plaintiffs injuries under La. Civ.Code art. 2317. To that extent, we affirm that part of the judgment placing liability on the sheriff.

*431
DAMAGES

In the $493,806.75 award to plaintiff, the trial judge in written reasons particularized the break down as follows:
Past and future physical pain and suffering $ 85,000.00
Past and future mental anxiety, emotional pain and suffering $104,000.00
Past and future loss of earnings and earning capacity $238,268.15
Past and future medical treatment 19and vocational rehabilitation $ 66,543.60
The facts regarding quantum are that, shortly after midnight, or about 12:20 or 12:30 a.m., on September 22, 1993, the 47-year old deputy plaintiff, while descending the steps of a building occupied and maintained by the sheriffs department, fell on a step when a tile broke resulting in injuries to plaintiffs right wrist, forearm, shoulder and back. After he was seen at the East Jefferson Hospital emergency room and later the next day by his physician, plaintiff was diagnosed as having acute cervical disk syndrome and pre-ex-isting degenerative cervical disk disease. Conservative, treatment was recommended. Thereafter, because of continued pain, his treating physician referred plaintiff to a neurosurgeon, Dr. John Schu-macher, who recommended continued conservative treatment. Because of plaintiffs failure to respond to that treatment, on October 11, 1994, approximately one-year post-accident, the neurosurgeon performed an anterior cervical discectomy and fusion at the C5-6 and C6-7 levels. A short time later, on October 19, 1994, plaintiff returned to his treating physician after he slipped and suffered neck pain. An examination by that physician indicated that the fusion had not been damaged. On January 4, 1995, plaintiff was released by his neurosurgeon to engage in activities to the extent that those activities could be tolerated.
On October 3, 1995, because plaintiff was experiencing chronic headaches and neck pain, as well as left elbow pain, Grieff returned to see his treating physician. It was on this visit that the treating physician noticed that plaintiff appeared anxious or had some anxiety. Because of complaints of headaches and neck pain, plaintiff made visits on December 13, 1995 to his neurosurgeon and in February 1996 to his treating physician.
In June 1996, plaintiff fell from a ladder and injured his ribs. Thereafter, on July 15, 1996 and again on August 1, 1996, plaintiff was involved'in two automobile accidents in which he sustained further injury. The neurosurgeon’s examination following those accidents indicated that plaintiff had suffered some |inmuscular injury and aggravation of his cervical condition; however, he did not suffer any further disk injury.
According to the neurosurgeon, while plaintiff had pre-existing cervical problems, the September 22, 1993 accident, while descending the steps at the work place, aggravated those pre-existing problems, necessitating the surgery <of October 11, 1994. He stated that plaintiff continued to suffer considerable neck and shoulder pain because of the accident.
Between the September 22, 1993 accident and the surgery in October 1994, plaintiff returned to his employment at the sheriffs department but was assigned to light-duty work. Prior to his injury, Grieff was assigned to the narcotics division. His new assignment was communications work and other light-duty assignments. Approximately one year post-surgery, in October 1995, because plaintiff had not returned to work following the surgery, the sheriffs office contacted plaintiff to ascertain when he could return to his employment. The sheriffs office, which continued to pay plaintiff, was interested in either his return to duty or for plaintiff to obtain medical documentation why he was unable to return to work. Because plaintiff failed to either return to work or to submit documentation, plaintiff was terminated in March 1997.
The primary basis for plaintiffs recovery is not that the fall on the steps caused the back injury, as well as other injuries, but that the fall aggravated the pre-exist-ing problems in the cervical area of the back resulting in continuous physical pain as well as deep emotional trauma. While *432 it is clear that Grieff suffered serious injury in his fall, resulting in an aggravation of the pre-existing injury, it is nonetheless difficult, from our consideration of the record, to subscribe to the concept that all of the plaintiffs problems, physical and emotional, resulted froth the fall and not from the multiplicity of injuries sustained in numerous accidents and falls which occurred prior to and subsequent to the September 22, 1993 fall. The chronology of those occurrences indicates that, between October 8, 1982 and August 1, 1996, plaintiff sustained neck, back, wrist and arm In problems which either caused or aggravated pre-existing injuries as a result of 12 or 13 falls and automobile accidents.
Also, significantly, it is clear from the record that, as far back as 1979, plaintiff had sustained injuries to the cervical area. In fact, in 1983, plaintiff was diagnosed as having cervical impairment at the C5-6 and C6-7 levels (the same cervical area where the fusion was performed on October 11, 1994). During that period and particularly in the early part of 1993, plaintiff was not responding to treatment for his cervical injuries and surgery was contemplated. In this early part of 1993; however, according to plaintiff, he was responding to medical treatment and had returned to work.
It is important that we consider all of these accidents in light of plaintiffs claims and the award by the trial judge. Those accidents and occurrences are as follows:
October 8,1982 Plaintiff first injured neck. Record is not clear as to the severity or the treatment.
August 1983 Plaintiff again injured neck, in a job related accident. Record not explicit as to treatment or injuries.-
1984 Plaintiff injured neck and complained of severe neck pains. Record is not clear as to the circumstances surrounding this injury.
July 1985 Plaintiff suffered a tennis injury and sought treatment.
March 7,1986 Plaintiff was involved in an automobile accident where he hurt his neck and shoulder. He had complaints of pain radiating across his shoulders and headaches.
October 19,1989 Plaintiff was involved in another automobile accident in which he hit his head on the automobile window. He sustained neck injury that necessitated 4 months of treatment. He sought medical help from this accident on October 25,1989.
1990 Plaintiff was involved in yet another automobile accident. On that occasion, he saw a physician, with whom he discussed the possibility of surgery.
May 15,1992 Plaintiff was involved in another automobile accident in which he injured his neck. He was treated from May through December 1992. Again, the possibility of surgery was discussed. Conservative treatment was administered (anti-inflammatory muscle relaxers and physical therapy). According to plaintiff, he responded well to this treatment and returned to work on “full-duty status.”
March 15,1993 Plaintiff fell off a chair and hurt his right ann. He underwent surgery on his elbow on May 7, 1993. Four months after the surgery, he still complained of elbow problems.
I i2September 22, The step incident at the sheriff’s 1993 office occurred.
June 1996 Plaintiff fell from a ladder and broke several ribs.
July 15,1996 Plaintiff was involved in another automobile accident. He went to East Jefferson Hospital and was diagnosed with aggravation of his neck injury and rib and chest injuries, which required 8-9 months of treatment.
August 1,1996 Plaintiff injured his chest and suffered neck pain in another automobile accident. He stated that he had ongoing pain since the surgery, but that it became “a little worse” since this automobile accident.
When we consider this litany of accidents and occurrences, between 1982 and 1996, we cannot conclude that all of plaintiffs neck pain, complaints, and injuries, as well as all of his emotional problems, stemmed from the aggravation of the neck injury that occurred from the September 22, 1993 fall at the sheriffs office. When *433 considering this voluminous record, despite the trial judge’s exhaustive reasons for judgment, we conclude that the judge was clearly wrong in this respect. We base our conclusion on the medical history and numerous accidents sustained by plaintiff. We are quick to point out, however, that the record clearly supports the conclusion of the trial judge that plaintiff suffered a serious aggravation of a pre-existing injury in the September 22, 1993 fall, resulting in severe neck pain and emotional trauma. We are also in agreement with the trial judge that the fall in the instant case contributed to the need for surgery, which resulted in a career ending procedure. Having so concluded, we find no error in plaintiffs entitlement to some loss of earnings.
Having concluded that the trial judge erred in attributing all of plaintiffs problems to this one accident, we consider each of the separate items of encompassing the $493,806.75 award. The first award is $85,000.00 for past and future physical pain and suffering. While we consider that amount in the upper limits of similar awards for aggravation of a preexisting condition, we cannot say that the amount of this item of damages constitutes an abuse of discretion.
| ^EMOTIONAL DAMAGES
The next item of damages, $104,000.00 for past and future mental anxiety and emotional pain and suffering posses a greater problem. The record is clear from plaintiffs testimony, the testimony of his wife, the testimony of others with whom he worked and the medical opinions of the physicians that plaintiff could not return to police work where he would be required to participate in the pursuit, apprehension, arrest and restraining of criminals. It is also clear from these witnesses’ testimony that police work was most important to him.
In October 1996, because plaintiff was experiencing emotional difficulties, he sought the help of a clinical social worker, Dr. Elliot Levine. According to Levine, police work was plaintiffs “... whole life,” and he was severely distraught, seriously depressed, and obviously suffering from serious emotional distress because he could not return to that work. Plaintiff perceived that the sheriffs department ostracized him because of his inability to return to police work. Plaintiff points to the testimony of his narcotics division commander in the sheriffs office who testified along with plaintiff that Chief Newell Normand made derogatory remarks to plaintiff, at a meeting with plaintiffs commander, about plaintiff having “either brittle bones” or he was fabricating his injuries. Grieff felt that there was a conspiracy to fire him after 21 years of faithful service and that he was no longer appreciated by the department. According to evidence in this record, this was devastating to plaintiff and was a primary cause of plaintiffs emotional stress and emotional problems. Levine diagnosed plaintiff as having post-traumatic stress disorder and one of the most serious cases of depression he has ever treated.
Levine classified plaintiff as totally nonfunctional for the first part of his treatment. Further, he was of the opinion that plaintiff will require approximately another five years of treatment, of a greater or lesser degree, though he believed that the period of treatment could be lessened with the use of medication. Finally, Levine opined that, although plaintiff, after discharge from treatment, |14would be employable in a sedentary capacity, he would never be able to return to police work. He added that he felt plaintiff could teach a class in criminal law or teach mechanics, because he was adept with mechanics. He expressed the opinion further that plaintiff would be limited by what he could physically endure. His observation was that plaintiff would require off and on treatment for approximately 5 years, but with this treatment, he would be functioning within a year or two.
*434 While plaintiffs emotional problems stemming from the September 22, 1993 accident were of the most concern to Levine, he recognized that other events contributed to plaintiffs poor emotional state. The most significant of these are that plaintiff was told on the day of his back surgery that his mother and aunt perished in a house fire and that he learned he was adopted.
Dr. William S. Brasted, a clinical psychologist, also saw plaintiff. While this expert, to some degree, disagreed with the clinical social worker, he emphasized that, with short-term therapy and with proper medication, pain management and psychological treatment, plaintiffs condition would substantially improve. He, like the clinical social worker, also stated that plaintiff was suffering from major depression and that his emotional problems resulted from varied “stressors.” According to Brasted, those stressors included the injuries that he suffered in the fall, other accidents and other traumas that he has sustained, the death of his mother and aunt in a fire, about which he was informed on the day of his surgery, the fact that he had learned that he had been adopted and primarily the fact that he could not return to the work that he enjoyed and loved as well as his being ridiculed and not appreciated by the department. According to this expert, if the medical records do not support excruciating pain, plaintiff can return to light duty work. Despite Grieff s resistance to treatment by anti-depressants, Dr. Brasted testified that with education the plaintiff would learn to use the anti-depressants without fear of becoming addicted. According to Dr. Brasted, with pain mismanagement treatment through a clinic and the use of medication for a period of approximately one year, plaintiff could return to work in one to three months.
When we consider this testimony, along with that of plaintiff and his wife, we are lead to conclude that plaintiff is entitled to compensation for emotional stress because of his injuries sustained in the fall from the steps. However, it is abundantly clear that this was only one factor in a multitude of stresses that plaintiff endured. Under these circumstances, we conclude that the $104,000.00 award to plaintiff growing out of the fall subject to this lawsuit is an abuse of discretion. When considering all of the stresses to which plaintiff was subjected, we conclude that a proper amount, at the upper limits, is $52,000.00.

LOSS OF EARNINGS

The trial judge awarded plaintiff $238,263.15 for future loss of earnings and earning capacity.[5] The judge concluded, from her appreciation of the evidence, that plaintiff would more likely than not be able to work after therapy approximately 20-25 hours per week for the balance of his work life. In reaching that conclusion, she relied on the testimony of Dr. Cornelius Gorman, an experienced vocational rehabilitation consultant and counselor who evaluated and treated plaintiff. In Dr. Gorman’s expert opinion, plaintiff will not be able to work for 40 hours per week, and instead, opines that plaintiff will only be able to work 25 hours per week. Presumably also based on Dr. Gorman’s testimony, and the testimony of Mary Elvere, also a vocational rehabilitation specialist, the trial judge concluded that plaintiff would likely earn $10.30 per hour.
The trial judge then relied on the testimony of economist, Dr. Mel Wolfson, to calculate plaintiffs total loss of earnings. Based on plaintiffs actual earnings for his last year of full employment, a 4.5% infla *435 tion rate, a 6.75% discount rate for the post-1997 period, and the vocational rehabilitation experts’ hours-perjweek16 (25) and hourly rate calculations ($10.30), Dr. Wolfson calculated the present value of plaintiffs future lost wages at $237,120.00.
The record clearly supports the observations of the trial judge that plaintiffs future earnings will be affected by his physical and psychological condition. However, that award pre-supposes that plaintiffs inability to work is caused solely and entirely by this one accident. As set forth previously in detail, it is inconceivable that a plaintiff with the physical and psychological medical history of Mr. Grieff can attribute his entire inability to perform his pre-accident job detail to the fall at the sheriffs building. In the same manner in which we reduced plaintiffs compensation for emotional damages, we reduce plaintiffs compensation for lost earnings. Acknowledging that much of plaintiffs inability to return to his pre-accident employment as a narcotics officer stems from this accident, yet mindful of the 12-13 events that also were factors, we reduce plaintiffs loss' of earnings award by 50%, to the highest amount reasonable.
In doing so, we reduce the amount of $237,120.00 (actual lost wages) by 50%. We subtract from this $118,560.00 award, $27,995.00, the amount of the deduction decided by the trial judge for plaintiffs failure to mitigate his damages. We reduce this amount, $90,565.00, by 15% or $13,584.75, based on the trial judge’s findings that “... Mr. Grieff s failure to timely seek psychiatric assistance has extended his inability to return to full employability further into the future.” Finally, we add $45,892.00 for plaintiffs lost fringe benefits. In total, we award plaintiff $122,872.25 for loss of earnings.
The final item of damages is for past and future medical treatment and vocational rehabilitation. The trial judge awarded $66,543.60. From our appreciation of the record, that figure does not take into consideration the stipulation entered into that the total amount of medical bills incurred in connection with the September 22, 1993 fall, amounting to $23,343.60 has been paid. Subtracting that amount requires a reduction to $43,200.00 for plaintiffs 117loss in this category. We, however, find that the record does support the trial judge’s $2,700.00 award for vocational rehabilitation:
Accordingly, we affirm in part, reverse in part and amend in part. We affirm that part of the judgment finding the Sheriff of Jefferson Parish liable for the plaintiffs injuries. We reverse that part of the judgment finding the Parish of Jefferson liable. On damages, we affirm the trial judge’s $85,000.00 award for past and future physical pain and suffering. We amend the trial judge’s $104,000.00 award for mental anxiety and emotional pain and suffering to $52,000.00, the highest reasonable amount. We further amend the trial judge’s $238,263.15 award for past and future loss of earnings and earning capacity to $122,872.25, the highest amount reasonable. Finally, we reduce the trial judge’s $66,543.60 award for past and future medical treatment and vocational rehabilitation to $43,200.00. Accordingly, we hold that the total amount of the award in favor of William Grieff and against the Sheriff of Jefferson Parish is reduced from $493,806.75 to $303,072.25, with legal interest from date of demand. Each party to bear his respective cost.

AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART.

. Plaintiff is also referred to in the record as "Griff.”

. The procedural history of this case is that plaintiff filed suit against the Parish of Jefferson claiming that it was strictly liable as the owner of the building and negligent in the *428 maintenance of that building. The parish then filed a third-party demand against the Sheriff of Jefferson Parish seeking contribution and/or indemnity on the basis that the sheriff's office had custody of the building and assumed tire maintenance. Thereafter, plaintiff in an amended petition filed a suit directly against the sheriff. Prior to a trial on the merits, the parish obtained a partial summary judgment in which the court determined that the parish was not the custodian of the building and therefore not liable under La. Civ. Code art. 2317. However, the trial judge denied the parish’s motion for summary judgment under La. Civ.Code arts. 2315 and 2322.

. La. Atty. Gen. Op. No. 87-45 provides as follows: "In the absence of a specific provision providing for the ownership of real property by the Sheriff's office, the property should be acquired in the name of the parish.”

. See Myers v. Burger King Corp., 92-0400, 93-1626 (La.App. 4 Cir. 5/26/94), 638 So.2d 369, where an owner of ground, who did not construct, repair, maintain, or improve the building, but leased the ground to a restaurant chain, was relieved of responsibility under La. Civ.Code. art. 2322.

. The trial judge calculated the total amount of loss of earnings, $238,263.15, as follows: ($237,120.00) present value of plaintiff's future loss wages, reduced by $27,995.00 for "his failure to attempt to mitigate his damages by attempting to return to light duty or seeking psychiatric treatment for the period between .October 1995 and October 1996" and ".. .further reduced by 15% in that Mr. Grieff’s failure to timely seek psychiatric assistance has extended his inability' to return to full employability further into the future." To this $192,371.15, the trial judge added $45,892.00 in lost fringe benefits.