814 So.2d 95 (2002)
Linda M. GORTON, Plaintiff-Appellant,
v.
OUACHITA PARISH POLICE JURY, Defendant-Appellee.
No. 35,432-CA.
Court of Appeal of Louisiana, Second Circuit.
April 3, 2002.
*96 Deal & Cook, Philip T. Deal, for Appellant Linda Gorton.
Neal G. Johnson, for Appellant Richard Fewell, Sr.
Hayes, Harkey, Smith & Cascio, Joseph D. Cascio, Jr., Charlen Trascher Campbell, for Appellee Ouachita Parish Police Jury and Coregis Ins. Co.
Before CARAWAY, PEATROSS and DREW, JJ.
DREW, Judge.
The Ouachita Parish Sheriff appealed a judgment awarding a deputy, Linda Gorton, damages for injuries sustained when she fell on a wet floor in the hall outside her office. The sheriff asserted that the trial court erred (1) in finding no liability *97 on the part of the other defendants, the Ouachita Parish Police Jury (OPPJ) and its insurer, (2) in concluding that the condition of the floor created an unreasonable risk of harm to Gorton, (3) in failing to find fault on Gorton's part, (4) in awarding excessive damages and (5) after ruling the plaintiff totally and permanently disabled, in awarding damages for lost future earnings and earning capacity of plaintiff. Gorton also appealed and urged that the trial court erred in failing to find the police jury and its insurer solidarily liable with the sheriff for her damages. For the following reasons, the judgment is amended and affirmed. The matter is remanded for the trial court to set the amount of trial and record preparation costs. La. R.S. 13:5112.

FACTUAL AND PROCEDURAL BACKGROUND
A deputy sheriff with the Ouachita Parish Sheriffs Office (OPSO), Linda M. Gorton, did clerical work at the Ouachita Parish Correctional Center (OPCC). On February 15, 1995, plaintiff sustained injuries when she slipped and fell on a terrazzo floor in the hallway outside her office. There was no worker's compensation coverage. Plaintiff sued the OPSO and the OPPJ, the owner of the correctional facility, and the police jury's insurer. She alleged that the condition of the floor created an unreasonable risk of harm to her and that the sheriff failed to provide her a reasonably safe place to work.
Following a two-day bench trial, the trial court rendered lengthy reasons for judgment. The trial court dismissed with prejudice plaintiff's claims against the OPPJ and its insurer. Plaintiff's award was a total of $451,230.24 for various elements of damages against the OPSO along with costs and expert witness fees.

TESTIMONY

Plaintiff, Linda Gorton
Linda Gorton (DOB 2/28/42) testified that she attended school until tenth grade and later obtained a GED. Divorced in 1983, her only work experience was working a debit route for a life insurance company for a couple of years. On July 18, 1983, she began working for the OPSO as a deputy at the correctional center where she assisted the shift sergeants with general clerical duties such as answering the phone and opening mail. She transferred to the Patrol Unit in December, 1983. After several years of working as a patrol deputy, she transferred back to the correctional center in August of 1990 or 1991 as secretary to the warden. Initially, her office was located in what she described as the outer compound in a different building from the site of her fall. Her office was moved to the location where she fell in the inner compound in January, some six weeks before her mishap in February 1995.
In the five years she worked at the correctional center before she was transferred to the office where she fell, Gorton stated she usually went to the accident site to pick up mail about 7:00 A.M. when her work day began. Gorton also stated that during the years she was on patrol, she occasionally went to the Correctional Center and used the hall where she fell. Gorton said she seldom ate at the dining hall when she worked in the outer compound, but when she did, she used that same hall which led to the dining area.
Concerning health problems prior to her fall, Gorton set out her earlier medical history which included neck vertebrae surgery in 1979 and a mastectomy for cancer in 1985. Gorton recounted that in 1990 she had a CAT scan of her back when she went to the emergency room with back *98 pain. Dr. Albert Donald treated her in the ER and gave her a shot. Gorton reported that two hours later she was fine and had no further problems with her back until her fall in February 1995. Gorton testified she had a heart attack in 1993, had triple by-pass surgery, was off work from May to October, was released with no restrictions and returned to work with no problems. For the year 1995, the year of her fall, and from her rehire in 1996 through her termination, Gorton recounted all of the days she missed work due to illness. Her last day of actual work at the OPSO was April 7, 1999 when she had another heart attack which she characterized as very mild. After her cardiologist treated her with a balloon procedure, he released her to return to work. Gorton was informed she would not be allowed to return to her employment at the OPSO and advised that her last day of employment was June 3, 1999.
On February 15, 1995, Gorton described stepping out of her office into the hall where she slipped and fell. Not a complete fall, Gorton said she broke the fall with her hand and knee. She returned to the office and reported her accident to Lt. Don Wheelis. She told him that the floor was wet and something needed to be done. Stating she normally had lunch between 11 and 12 noon, she recalled she had been in her office about two hours before she fell about 2 PM. She did not notice water on the floor when she went and came back from lunch, but stated she saw it was wet when she slipped. As she lost her footing, she described doing a lot of twisting and fancy footwork in her effort to avoid falling. Her back hurt and continued to get progressively worse along with her right hip and leg. After the fall which took place on a Wednesday, she was barely able to walk by the following Monday.
Lt. Wheelis instructed Gorton to fill out an accident report. Gorton first sought medical care on Monday, February 20. The OPSO made her an appointment with Dr. Elliot whom she saw several times. Treated with medication, Gorton stated her condition worsened. In March, she had a CAT scan after which Dr. Elliot referred her to Dr. Brown, an orthopedic surgeon.
In June 1995, Dr. Brown performed a percutaneous back surgery with a needle due to Gorton's constant pain in her leg and hip and her difficulty walking. That surgery was not effective. Gorton testified she worked off and on and with difficulty and pain. On August 8, 1995, Dr. Brown performed regular back surgery. Gorton stated she did not return to work that year. When she used up her accumulated leave time, Gorton was cut back to half pay in September which she received for a couple of months. Because she could not live on the reduced pay, she resigned effective December 1, 1995, and drew out her retirement contributions to secure funds on which to live.
During the period in 1995 she was on half pay, she testified she consulted with Chuck Cook who was elected sheriff in the fall of 1995. When informed about the fall and the subsequent events, Cook advised her to seek legal advice, according to Gorton. Gorton testified that prior to Cook's taking office in July 1996, she again talked to him in May or June 1996 about her returning to the sheriffs office and Cook offered her employment when he took office. Gorton testified that they discussed her pending lawsuit and Cook said it would not relate to her returning to work, since "that's on Laymon Godwin."
Although during her twelve years of employment with the OPSO, Gorton had seen blankets on the hall floor, she testified she had never noticed condensation on the *99 floor before her fall. She had never heard anyone discuss the condensation or slipping problems before her fall. She also testified she did not recall whether or not the outside door was open when she arrived at work in the morning, nor when she left and returned from lunch and nor when she went home after working several hours of overtime on the evening after her fall. However, she was certain the door was open when she fell, because the fall resulted in her facing the door.

Former OPSO Deputy Dale Robert
When he left the OPSO in 1996 after twelve years, Dale Robert testified he was program director/operational officer at the OPCC. In charge of maintenance at the facility, Robert took care of the heating and air among other things. In the building where plaintiff fell, there was a heating unit, but the only air conditioning was from window units in supervisors' offices. Robert testified that moisture accumulated on the terrazzo floor every time there was a dramatic temperature change and the doors were left open. He explained that if the floor was warm and the temperature was cold outside with high humidity, condensation formed on the hall floor when the door was left open. The open door made the situation worse and the door was opened frequently because many people came in and out that way. A film of moisture built up on the entire floor. The deputies attempted to alleviate the wetness with inmates mopping or putting down blankets. Robert stated this occurred many times during a year and he described clean up efforts as "fighting a losing battle." Because the floors were kept waxed, Robert testified that when the moisture developed, the floors became slick. Robert stated mats were used to alleviate the problem after Gorton's accident. He did not recall mats being used on the floors any time prior to plaintiff's fall. Wet floor signs were used during mopping. Although he requisitioned from the OPPJ products to make concrete floors in the area anti-skid, he did not recall anyone trying to get anything to skid-proof the terrazzo floors. Robert testified that members of the OPPJ toured the facilities.
On cross-examination, Robert acknowledged that the OPPJ furnished all the supplies used to maintain the OPCC. The OPSO used inmate labor. Work that could not be done by inmates or was subject to the bid law was handled by the OPPJ which bid out the work to independent or selected contractors. Robert compared the moisture in the hall floors to a heavy dew in the morning which occurs when warm temperatures are followed by cooler air so that condensation builds up. For the moisture to form on the floor, there had to be air either cooler or warmer than the floor and moisture in the air and a change in the temperature. According to Robert, any deputy working at the farm had a responsibility to tell an inmate to correct a problem.
Robert stated that due to frequent complaints about the slick floor, he had purchased boots which helped him somewhat. He never requisitioned anything to address the slick terrazzo floor. Robert stated that through the chain of command, he was in charge of daily repairs of anything that needed attention at the facility. The process was to requisition the OPPJ which supplied the request if the budget permitted.

OPSO Deputy Sylvester Britton
Sylvester Britton, a corporal with the OPSO at the time of trial, testified that he was shift supervisor at the OPCC when plaintiff's fall occurred. After learning from an officer that Gorton had fallen, Britton said he had inmates spread blankets on the floor by the back door. He recalled that the day was very foggy. *100 Britton stated that the wetness was caused by the fog and condensation coming through the door into the hall. The door was open and had to be propped to keep it open. Britton testified that the moisture was not caused by mopping, a toilet overflowing or rain being tracked inside. Sometimes the door was left open which allowed condensation in and made the situation worse, according to Britton.
Prior to Gorton's fall, Britton did not recall rubber mats ever being put on the floors to prevent slipping. According to Britton, inmates were assigned to keep the hall clean. He noted that waxing was done at night. Britton testified no one, including Gorton, complained to him before her accident about the hall being slick and no one had reported an accident. On cross-examination, Britton stated when he learned about the accident, he walked into the hall and noticed the floor was wet and the door was open. He asked an inmate to place blankets down. Britton asserted that if someone had an accident, even if he was uninjured, the person was still supposed to make an incident report.

OPSO Deputy Billy Mann
Billy Mann, a OPSO shift lieutenant at OPCC, testified at the time of the accident he was a shift supervisor. Up until a couple of months before trial, Mann had worked with Gorton whom he described as a good worker. After the accident, Mann observed that she couldn't bend over, acted as if she was in pain, walked with a limp and could not squat down. That condition lasted for as long as Mann worked with the plaintiff.
Prior to the accident, Mann had observed moisture on the floor which he stated occurred every time there was humidity in the air. Since he started work there in 1987, OPSO personnel used blankets for the moisture. The practice was to wait until the floor got wet which happened any warm humid day and then to put down blankets on the moisture. Prior to Gorton's fall, rubber mats were never used on the floor. Mann did not recall yellow warning floor signs being used prior to Gorton's accident and reported he had slipped on the floor himself. Mann also testified that everyone who had worked there had slipped. According to Mann, slipping happened so often it was a regular part of the job. Mann said that they complained about the condition to the commander but nothing was done. Further, the witness stated he knew of no accident reports being made about the slips when no one was injured. Mann stated the central heat in the hall did not work and that in winter there was no heat in the halls. Further, there was no air conditioning in the hall, so in summer they opened the door.

Ouachita Parish Sheriff Charles L. Cook
Charles L. Cook, Ouachita Parish Sheriff at the time of trial, testified he took office in July 1996. He acknowledged that he spoke with Gorton toward the end of 1995 when she told him she was almost out of sick leave and would be reduced to ½ pay. They discussed the possibility of her seeing a lawyer. Prior to Cook's taking office in July 1996, they discussed her returning to work at the OPSO. She was released by her doctor with restrictions against heavy lifting and returned to work July 1, 1996. The sheriff stated that he did not know she had a pending suit against the OPSO when she came back to work. Cook said he was aware she had missed some 30 days due to a heart condition shortly before the trial. At trial Cook testified he had no information from her cardiologist or her orthopedic specialist that she could not perform the same work she had satisfactorily performed for some three years before the accident.
*101 Cook terminated Gorton as of June 4, 1999 because he became aware of her multiple health problems during the depositions for this proceeding. Cook learned she had a foot problem, a knee problem, a heart condition and had been working in pain for three years. Her working in pain and the fear that she would reinjure herself were factors in the termination. The Sheriff also stated he would not have rehired Gorton in July 1996 if he had known she had a pending suit against the department and that he had a problem with any employee continuing work after suing the department.

Thurman Potts, Architect
An architect for commercial buildings, Thurman Potts testified he came to Northeast Louisiana University in 1966 where he served as director and instructor of the Building Construction Department until his retirement in 1987. The court accepted Potts as an expert witness on architecture. Potts testified that terrazzo was one of the slickest and most expensive types of flooring. Further, it was difficult to discern wetness on terrazzo. The building did not have heating in the hall. Condensation occurred when warm moist air came in contact with the cold floor. On February 13 before the accident, the low and high temperatures were in the 30s while on February 15, the temperature rose from a low of 58 to a high of 69 degrees with 100% humidity. Potts opined that the heating system was not adequate to keep the hall floor warm. Potts stated condensation problems have nothing to do with old buildings lacking air conditioning, but that condensation would occur when the terrazzo floors got cold.

OPSO Deputy Clarence Britton
An eighteen-year veteran with the OPSO, Clarence Britton was commander of the OPCC at the time of Gorton's accident. He testified that maintenance and cleaning was a joint effort of the OPSO and the OPPJ. The OPSO possessed and took care of the facility. When something broke, OPSO personnel requisitioned the needed material which the OPPJ provided. Britton acknowledged that, in response to interrogatories, the OPSO had responded that the floor had a film of condensation at the time of Gorton's fall. Before that incident, condensation would occasionally occur. If the weather was right and the door was open, deputies knew before it happened that condensation would form.
In Britton's view, Gorton should have known about the condition of the floor, since it was mopped several times a day and was slippery even when not wet. Everyone who worked at the correctional center knew the floor was slippery. Britton also acknowledged no one had tried to solve the slippery floor problem prior to Gorton's fall. Although he admitted he knew others had slipped on the floor, Britton testified Gorton was the only person who fell. Britton also testified that the hall was not heated well and that in an earlier construction, the vents to the hall were closed over. Britton opined that action had to have been approved by the OPPJ.
When he was commander, no one reported that something needed to be done about the slippery hall. Rubber mats could have been put down but no one thought that was necessary. After the accident, a rubber mat three feet wide and twenty-five feet long was used in the hall. It was removed when the hall was cleaned. Britton said a wet floor sign was in place when Gorton fell.

Cecil T. Janway, OPPJ Administrator
Cecil T. Janway, the Ouachita Parish Administrator, testified that at the time of Gorton's accident, the procedure used by the OPSO was to submit a work order or requisition for any required supplies needed *102 to maintain the OPCC. A large part of the work at OPCC was performed by inmate labor. Since the OPPJ had only one maintenance employee for all its buildings, the OPPJ had a service contract for the heating system at the OPCC. If work needed to be done, the sheriff would notify the contractor directly. Any large item outside of the approved budget had to be submitted to the OPPJ. Janway stated he was not aware of any regular inspection of the OPCC by the OPPJ. According to the witness, he had no record that Gorton or anyone had complained to the OPPJ about the hall or the heating system.

Thomas Shutt, expert on heating systems
Testifying for the defense, Thomas Shutt was accepted by the court as an expert in the design of heating and air conditioning for commercial buildings. Shutt stated that the best way to avoid condensation was to keep the floor warm. After inspecting the facilities, Shutt offered the opinion that nothing was substandard and that the forced air heating system was satisfactorily designed and had sufficient ducts to keep the floor adequately heated. He recognized if the furnaces were not working or if the duct vents were closed off, then the floor in the hall would get very cold. Shutt also recognized that no heating system could accommodate having the door propped open.

Herbert Land, Architect
Herbert Land, the architect who designed the facility, was accepted by the court as an expert of architecture in Louisiana. Land testified that Sheriff Bailey Grant specifically requested that Land design the jail built in 1966 with terrazzo floors, since they were easy to keep clean. The building was designed with only a heating system. The core sample of the floor showed it was properly constructed. Land never received any complaints about floor condensation or the heating system. Explaining that condensation occurred when warm moist air hits a cold surface, Land stated that no heating system could prevent condensation when the door was propped open. Land opined that the moisture on the floor when Gorton fell was caused by frequent moppings.

Plaintiff, Linda Gorton
On rebuttal, Gorton testified that in March 1998 she took photos of the area where her fall occurred. These photos were later placed into evidence. After she returned to work in 1996, rubber mats were used at times in the hall area. She specifically took the pictures of the site of her fall at a time when the mats had been taken up so the photos would show the hall floor itself.

TRIAL COURT'S REASONS FOR JUDGMENT
The trial court noted that plaintiff alleged that her fall was caused by a defect to the premises; i.e., defective or negligent construction or maintenance which permitted condensation to accumulate outside her office on the floor. The trial court made the following factual findings:
What is now the Ouachita Correctional Center was built during the early 1960s pursuant to the design of former Sheriff Bailey Grant. Herbert Land was the architect on the project. At that time, the facility was made up of a kitchen, two dining areas, a prisoner visiting area and office space. The hallway flooring was terrazzo. At the time, a central heating unit was placed in the facility but there was no central air conditioning unit utilized.
At the time of the accident, which occurred on February 15, 1995, Sheriff Laymon Godwin was in office and in charge of OCC. He was also originally named in this suit. However, when Sheriff Chuck Cook took office, he and *103 his insurer, Coregis were substituted for Sheriff Godwin and his insurer.
Testimony tended to show that the hallway just outside where Deputy Gorton was working on February 15th was a heavily traveled area, with prisoners being brought through several times per day. It was also a hallway frequently used by other personnel at the facility.
Testimony also showed that, because there was an inoperative or inadequate heating system in that building and the doorway at the end of the hallway was frequently propped open, condensation occurred on the flooring in the hallway on a regular basis. Prior to the accident, if there was humidity in the air, there was moisture on the floor. This occurred throughout the year if atmospheric conditions were right. Sometimes, there would be a couple of days of it, and they would have inmates mop the area and/or try to use blankets to keep it dry. However, blankets were never put down until after the floor was wet.
Even the testimony of the experts, though in disagreement as to whether the heating system was adequate to heat the floor, agreed that if the door at the end of the hallway were left open on warm, moist days after a time of cold days, the result would be condensation on the terrazzo flooring.
At least some deputies had complained about dampness and slipping but nothing was done to permanently correct it. Complaints were made by wordof-mouth only, thus there were no incident reports. Deputy Roberts pointed out that, though several people had complained about the problem, he never made a purchase order to cure or fix the problem, and stated that the police jury would not have come out to do work without talking to the Sheriff first.
On February 15, 1995, there was fog and lots of condensation appearing on the floor. Deputy Gorton had been transferred, just six weeks prior, to the inner compound where the accident occurred. On the day of the accident, she had gone to lunch without noticing anything on the floor and had returned at 12:00 noon, again without noticing anything on the floor. When she exited the office again, at 2:00 p.m., she slipped and fell, but not completely, breaking her fall with her arm and knee.
Deputy Gorton reported the incident to her supervisor, Lt. Don Wheelis, with whom she shared the office. At the time of the accident, Deputy Gorton didn't notice any water or wet floor signs.
After the fall, she experienced pain in her back and hip. The pain became so intense, that by the following Monday, February 20, she was unable to walk. Deputy Gorton saw Dr. Clyde Elliot who treated her with medicine. Because she continued to worsen, Dr. Elliot ordered a CAT scan. She was then referred to Dr. Brown who ordered an MRI. Dr. Brown performed a percutaneous disk procedure in June of 1995. Deputy Gorton worked off and on until Dr. Brown did the first surgery, working through the pain, but did not work anymore after October 8, 1995 until she returned to work at OCC under Sheriff Chuck Cook in July of 1996.
Deputy Sylvester Britton, a shift supervisor at the time of the incident, learned of the accident from Lt. Wheelis. Upon learning of the incident, he had inmates place blankets in the hallway just inside the back door.
Clarence Britton, Commander at OCC, investigated the incident. His investigation revealed that there was condensation *104 on the floor at the time of the accident.

Liability of the OPPJ
The sheriff is the keeper of the jail. La. R.S. 33:1435. The OPPJ has an obligation to provide a good and sufficient jail. La. R.S. 33:4715. The OPPJ is also responsible for its physical maintenance. La. R.S. 15:702. While the police jury must provide financially for the maintenance of the jail, the sheriff has the responsibility for operations. City of Shreveport v. Caddo Parish, 27519 (La. App.2d Cir.6/23/95), 658 So.2d 786, writs denied, 95 2285, 95 2298 (La.11/27/95), 663 So.2d 728,729; Langley v. City of Monroe, 582 So.2d 367 (La.App. 2d Cir.1991).
At the time of this accident and prior to its amendment in 1996[1], La. C.C. art. 2322 stated:
The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction.
Citing Olsen v. Shell Oil Co., 365 So.2d 1285 (La.1978), the trial court pointed out that the owner's duty is non-delegable. However, the owner is liable only when the ruin is the result of the owner's neglect or failure to repair or when the ruin is caused by a flaw in original construction. When the owner does not have actual custody of the building, ruin is limited to an actual fall or collapse of the building. Griffin v. Foti, 523 So.2d 935 (La.App. 4th Cir.1988), writ denied, 531 So.2d 272 (La.1988).
The trial court concluded that no ruin existed on which to base liability against the OPPJ which the trial court found to have fulfilled its statutory obligations to provide a "good and sufficient" jail. Gorton's action against the OPPJ and its insurer were dismissed.

Liability of OPSO
Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. La. C.C. art. 2315. We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. La. C.C. art. 2317. La. R.S. 23:13 directs that every employer shall furnish employment which shall be reasonably safe for the employees and shall furnish and use safeguards and methods reasonably adequate to render such employment and the place of employment safe. In order for an employee to recover from her employer, she must prove, among other things, that her accident and injuries were caused by an unreasonable risk of harm created by the employer's failure to properly fulfill the duties imposed by La. R.S. 23:13. Jones v. Trailor, 93-2144 (La.App. 4th Cir.4/28/94), 636 So.2d 1112, writ denied, 94-1337 (La.9/16/94), 642 So.2d 193.
The trial court concluded that the condensation was caused by an inadequate or inoperative heating system which resulted in the terrazzo floors in the hall becoming very cold and susceptible to condensation when warm moist days followed cold periods. The trial court stated that condensation had been a problem at OPCC at least since 1984 and that most of the employees were aware of it. Inmates mopped and placed blankets on the floor to remedy the moisture. Testimony revealed that the terrazzo floors tended to "hide" dampness *105 on the floor. Because condensation was not an everyday occurrence, the trial court opined that it was unreasonable that the employees at OPCC had to carefully check to see if the floor was damp and if they could walk without slipping. Since the moisture was intermittent, the trial court stated the employees should not have to make daily inspections to determine if it was safe to proceed. Specifically, the trial court determined that the condensation was an unreasonable risk of harm and caused plaintiff to fall and sustain injuries.

Comparative Negligence of Gorton
The trial court cited Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967 (La.1985), which held that:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
Gorton testified she was unaware of the condensation problem and had been working in the area where she fell less than two months. The hall had heavy traffic and was frequently mopped. Noting no evidence indicated that Gorton knew about the occasional condensation, the trial court found it was unlikely she was aware of the condensation problem. Further, Gorton having to check the floor for dampness every time she left her office was unreasonable, according to the trial court.
As the keeper of the jail, the OPSO should have repaired the problem or provided safety devices to remedy the danger. Although all deputies had the authority and obligation to watch for spills or other dangers, only certain deputies could requisition floor mats or seek to have the heating repaired. Since Gorton was not among those, she was in an inferior position.
The trial court observed there was no testimony Gorton was proceeding in haste. Although she was unaware of the problem, the trial court opined that, even if she had been aware of the problem, the intermittent condensation happened only when atmospheric conditions were just right. Thus, the condensation was an occasional problem with dangerous consequences. Gorton's ability to move in and out of her office should not have been dependent on her being on constant watch for weather conditions and condensation. The trial court concluded that Gorton was not responsible for her fall and injuries. Further, the OPSO failed to provide a safe workplace.

Quantum
The parties stipulated that the sheriff paid Gorton's medical expenses of $36,927.94 for which the OPSO would receive a credit against any amounts awarded Gorton.

Past Lost Wages:
After her second surgery on August 8, 1995, Gorton left her employment until she returned to the OPSO on July 1, 1996. The trial court stated her salary when she left was $2,416.44 per month and she missed eleven months, less one week. Detailing its calculations, the trial court set her lost wages at $26,060.24.

General Damages:
Medical testimony established that after her two surgeries, Gorton had a 20% total body disability attributable to the fall. Another 10 to 15% disability related to other causes. When Gorton returned to work in 1996, her doctor instructed her to restrict herself to light duties and not to *106 bend, twist, lift or climb. Sheriff Cook discharged Gorton from her employment in June 1999 due to his concern with her continuing pain and the possibility of her reinjuring herself. At trial her doctor testified she still had back pain from time to time and still complained of foot pain at her last examination March 2, 1999. The trial court awarded Gorton $175,000 in general damages based upon her continuing pain, her 20% disability attributable to the fall and her permanent restricted movement.

Lost Earning Capacity:
The trial court awarded Gorton $250,170.00 in lost future earning capacity based upon the salary she would have earned in the next 93 months following her discharge. Gorton testified she planned to continue working until her sixty-fifth birthday on February 28, 2007. The trial court rejected the OPSO's argument that Gorton's 20% disability did not prevent her from working. Emphasizing that the OPSO itself dismissed Gorton, the court relied upon the fact that the OPSO discharged the 57 year old (at trial) plaintiff from light duty clerical work due to her pain, physical condition and possible reinjury while arguing that a different employer would be willing to hire her with her 20% disability and restricted physical movements. Absent the award given for lost future earnings, the trial court stated that had Gorton worked at a minimum wage job, she would have been working in pain and would have been entitled to a greatly increased award for future pain.
Subject to the credit for medical expenses paid previously, Gorton was awarded a total of $488,158.18. Costs were cast against the defendant along with interest from the date of judicial demand.

DISCUSSION
In Lewis v. State, DOTD, 94 2370 (La.4/21/95), 654 So.2d 311, the supreme court explained that an appellate court may not set aside a trial court's factual findings unless they are manifestly erroneous or clearly wrong. For reversal on appeal, the appellate court must find (1) a reasonable factual basis does not exist in the record for the factual findings of the trial court and (2) the record establishes that the factual findings are clearly wrong and manifestly erroneous. The appellate court must do more than look at the record for evidence which supports or discredits the trial court's findings. The reviewing court must review the entire record to determine whether the trial court's findings were clearly wrong or manifestly erroneous. In addition, the appellate court must decide if the trial court's conclusions were reasonable. Even when the reviewing court may conclude that its own evaluations are more reasonable than the trial court's, the appellate court should not substitute its judgment for that of the trial court. Lewis, supra. Our review of this entire record clearly shows that this trial court's factual findings were reasonably based upon the evidence presented and are neither manifestly erroneous nor clearly wrong.

Liability of OPPJ
The trial court correctly determined that the police jury and its insurer have no liability for plaintiff's injuries. While the OPPJ had the statutory mandates to provide a good and sufficient jail and to maintain it, the record showed that the sheriff was custodian of the jail which was built to a prior sheriffs specifications. While the OPPJ reimbursed the OPSO for the salaries of some jail employees of the OPSO, the entire operation and maintenance of the correctional facility was the responsibility of the Ouachita Sheriff. Repairs *107 and upkeep were performed primarily by inmate labor under the direction of the sheriffs deputies. As the trial court correctly noted, the OPPJ did not have custody of the OPCC. The police jury financially supported the facility which the sheriff possessed and operated. In order for repairs or maintenance to be done at OPCC, sheriff's personnel filed a requisition or a work order. In response, the OPPJ provided the materials for the work done under supervision of OPSO. For items such as the heating system on which the OPPJ had contractual service arrangements, OPSO personnel contacted the businesses directly for service and repairs and did not go through the OPPJ. OPSO never made any request of the OPPJ for materials or financial assistance to deal with the slippery floor in the hall where Gorton fell. The OPPJ was not negligent in maintaining the facility.
As to strict liability under La. C.C. arts. 2317 and 2322, the unique relationship of the sheriff and the governing body regarding responsibility for jails was discussed at length in Griffin v. Foti, supra. Noting that the underlying basis of the fault in both forgoing articles was the legal relationship between the defective thing and its owner or custodian, the court stated that art. 2317 did not apply because the governing body did not have custody or control of the building, only the responsibility to fund maintenance. Although the facts are not identical, the OPPJ did not have control and custody of the OPCC. The trial court correctly found that no liability exists under La. C.C. art. 2317.
According to the OPSO, the trial court's own reasons for judgment established that the OPPJ breached its duty to provide an adequate jail, since the problem of condensation resulted from "inadequate or inoperative heating system" which made the floor vulnerable to condensation under certain weather conditions. The sheriff also contended the police jury should have known or should have ascertained the condition of the premises. The sheriff further noted that the OPPJ reimbursed the sheriff for salaries of deputies working at OPCC and that OPPJ carried the insurance on the structure. The plaintiff agreed with the sheriffs argument that the OPPJ shared the liability for her injuries as owner of OPCC. Plaintiff argued that the notice requirements of La. C.C. 2322 were added by 1996 amendments and do not apply to this 1995 accident. Since the inadequate or inoperative heating system was a principle cause of this accident, in plaintiff's view, the OPPJ, as owner, had the non-delegable responsibility to keep the building in good repair.
As noted in Griffin v. Foti, supra, La. C.C. art. 2322 does not distinguish between an owner in control and possession of a building and one who is not. Although the liability of the owner is nondelegable, the interpretation of what constitutes "ruin" under art. 2322 has varied from a literal collapse of the building or a major component (owner with no custody or control) to recovery for defects in parts of the building (owner/custodian). The liability of the owner under art. 2322 is derived from its status as custodian or lessor as well as owner. Because the governing body in Griffin v. Foti, supra, did not possess or have custody of the jail, nor was it the lessor, the court applied the strict interpretation to the term "ruin" to mean an actual collapse of the structure or one of its components. The leaking shower was not a ruin and the governing body which owned the facility was not responsible, although Sheriff Foti who had custody and control of the jail was responsible for the prisoner's injuries resulting from his fall. Griffin v. Foti, supra.
*108 In Grieff v. Parish of Jefferson, 98 1262 (La.App. 5th Cir.12/13/00), 780 So.2d 425, writs denied, 2001 0330, 2001 0341 (La.4/12/01), 789 So.2d 592, 593, the court found that Jefferson Parish, the owner of the sheriff's office facility, was not liable to a deputy who fell on defective steps. Ownership by virtue of "paper title" was insufficient under La. C.C. art. 2322 to hold the parish liable. The named owner was Jefferson Parish, but the parish had title to the property only for convenience, since there was no authority for the sheriff to own property. In fact, the sheriff for all intent and purposes was the real owner. The sheriff had acquired the land, provided funds for purchase, solely occupied the building, had full responsibility for maintenance and had agreed at the time of purchase to pay for the insurance.[2] The sheriff had complete custody and control of the building. Unlike a lessor, the parish derived no economic benefit from the building. Grieff v. Parish of Jefferson, supra.
While the facts in this case differ somewhat from those in Grieff, supra, it is clear from the record that the sheriff acted as owner and operator of the building. The OPPJ fulfilled its duty under La. R.S. 33:4715 and La. R.S. 15:702 to provide a good and sufficient jail and funds for its maintenance. The OPPJ is the owner of the correctional center, but under the statutory scheme the OPSO is possessor and custodian with control over all aspects of the facility. Since the OPPJ did not possess or have custody of the facility, the trial court correctly found that there was no "ruin" for which to hold OPPJ liable and dismissed plaintiff's action against the police jury and its insurer.

Liability of OPSO
The plaintiff proved by a preponderance of the evidence that the negligence of the OPSO resulted in an unreasonably dangerous condition which caused plaintiff's fall and injuries. As the trial court correctly found, the condensation on the hall floor was a recurring and long standing problem of which the sheriff's deputies and supervisors were aware and which they addressed only after it occurred by putting down blankets or mopping. When the weather conditions produced the moisture on the floor, the condensation was exacerbated by the practice of propping the door open. The evidence supported the trial court's conclusion that the heating system in the hall area was inadequate or inoperative making the hall floor susceptible to condensation in the specific weather conditions. Even if that was not the case, expert testimony from both Shutt and Land was that no properly operating, sufficient heating system could provide adequate heat in light of the practice of propping the door open.
Although many complained about the slippery condition, no one with authority with the OPSO made any attempt to address and correct the problem by putting something on the floor to make it less slick (as was done with concrete floors at the facility), acquiring mats or other safety equipment to deal with the problem or taking any other action. Further, the condensation was intermittent and difficult to see on the terrazzo resulting in an unreasonable burden on employees to check for moisture before stepping into the heavily used hall. The evidence supports the trial court's findings that the OPSO was negligent and failed to furnish and use safeguards reasonably adequate to provide a safe workplace. Those conclusions were neither manifestly erroneous or clearly wrong.

*109 Comparative Fault of Plaintiff

The allocation of comparative fault is a factual matter lying within the discretion of the trial court. The trial court's determination must not be disturbed on appeal in the absence of manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989); O'Riley v. City of Shreveport, 30,107 (La. App.2d Cir.1/23/98), 706 So.2d 213, writ denied, 98-0752 (La.5/1/98), 718 So.2d 418.
On appeal the sheriff claimed that the trial court erred in failing to find the plaintiff at fault in her fall. Basically, the sheriff relied on plaintiff's use of the hall over the course of her entire employment and urged that she knew, or should have known of the occasional wet floors in the hall. Gorton gave testimony about her use of the hall while a deputy sheriff, about having moved to the location some six weeks before the fall, and about being unaware of the condensation and other persons slipping. Former and current deputies testified about the problems associated with the condensation. Noting there was no evidence that Gorton knew about the condensation, the trial court evaluated the evidence (see Comparative Negligence of Gorton, infra) and reasonably decided that Gorton was not negligent. Even if this court decided it was more reasonable to find that Gorton was at fault in some way, this court will not substitute its judgment for that of the trial court when there was no clear error and the judgment below was reasonably based upon the evidence. Lewis v. State, DOTD, supra.

Quantum
At the outset we note that, although both the sheriff and the plaintiff appealed the trial court judgment, neither side complained about two clear errors in the quantum awards. The parties stipulated that Gorton's medical expenses of $36,927.24 were paid by the OPSO and were to be credited against any recovery made by Gorton. However, the trial court neglected to include those special damages in the awards in favor of plaintiff. The judgment is amended to award Gorton special damages of $36,927.24 for her medical expenses. That amount will be credited against her recovery, since the OPSO previously paid the medical bills.
Next, the trial court awarded Gorton $26,060.24 for past lost wages because Gorton missed work for almost eleven months from August, 1995 until she returned to work for Sheriff Cook July 1, 1996. Plaintiff's monthly salary in August 1995 was $2,416.44. The trial court calculated that Gorton missed 17 days in August, 1995 and was entitled to $1,895.84 for that month and a total of $24,164.40 for the remaining ten months. However, Gorton herself testified that she was paid in full until her vacation and sick leave ran out in September, 1995. Thereafter, she stated she received ½ pay for one to two months after which she resigned December 1, 1995, to draw out her retirement because she could not meet her living expenses on half pay. Payroll records plaintiff introduced into evidence clearly show that Gorton was paid approximately half her salary for October and November 1995. The entries for September 1995 are very unclear but appear to indicate Gorton received her full salary that month. Based on her testimony and the evidence, we reduce her award for past lost wages, since she was paid her full salary for August and September 1995 and half pay for October and November. The award for past lost wages is amended and reduced to seven months (December through June 1996) at $2,416.44 per month ($16,915.08) and two months (October and November 1995) half salary ($2,416.44) for a total of $19,331.52.
*110 On appeal, the OPSO objected to two elements of damages awarded plaintiff by the trial court. First, the sheriff complained that the general damages award of $175,000 was excessive. In Beasley v. Yokem Toyota, 33,805 (La.App.2d Cir.8/23/2000), 767 So.2d 149, this court discussed general damages. La. C.C. art. 2324.1 provides that in assessing damages, much discretion must be left to the judge. To modify an award for general damages, an appellate court must find that the trier of fact has abused the "much discretion" accorded by the statute. Each case must be weighed and evaluated according to its own particular facts and circumstances. General damages involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money. The primary objective is to restore the injured party as nearly as possible to the state she was in at the time immediately preceding the injury. The factors to be considered in assessing quantum for pain and suffering are severity and duration and each case must rest on its own set of facts. The discretion vested in the trier of fact is "great" and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons may disagree about the appropriate amount of general damages in a particular case. Only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of a particular injury to that specific plaintiff should the appellate court increase or reduce the award. Beasley v. Yokem, supra.
Gorton testified that, after her fall and up until trial, she could not lift or do a lot of bending. She could no longer walk long distances and had to change her lifestyle by giving up fishing, bowling, yard work and some house work. She had constant discomfort in her left foot and leg pain almost daily for which she takes prescription pain medicine when necessary and Tylenol every day. Since the first surgery in June 1995, Gorton testified she worked daily with back pain and had to adjust her activities accordingly. She also said that she did not let her difficulties interfere with her job performance. Except for the work done for the OPSO, Gorton stated she had no other training or job skills. Gorton said she had planned to work until she could retire at 65 and knew of no other job she could get to earn $32,000 per year.
In depositions introduced at trial, Dr. Elliot, who initially treated her, described her as stoic in dealing with the pain of her injuries. Both he and Dr. Brown, who performed her surgeries, commented on how motivated Gorton was to return to work. Dr. Elliot stated Gorton tried to return to work but was unable to stay. Dr. Elliot reported that Gorton informed him she had fallen at work and twisted her left knee and back. Her knee improved with anti-inflammatory medicine, but her back pain and sciatic nerve pain down her right leg and right foot did not respond to conservative treatment with medication and physical therapy. The doctor stated she would seem to improve and then be in pain again in spite of the treatment. In March 1995 he sent her for a CAT scan which showed a large central disc protrusion at L4-5. He learned that the 1990 CAT scan showed disc protrusion at L4, but the 1995 CAT scan showed a much more pronounced problem. At that point, Dr. Elliot referred Gorton for treatment to Dr. Brown, an orthopedic surgeon.
Dr. Brown stated that, at her initial visit in March 1995, she reported that dating back to 1990, she had low back pain which had gotten worse over the last month due to an accident at work February 15, 1995. The doctor stated she had a CAT scan in *111 1990, had no surgical treatment and had been living with the discomfort without medical attention until this accident. The 1995 CAT scan showed a much larger disc protrusion than the 1990 CAT scan. Gorton reported pain in the right side of her low back, aching, burning, pins and needles sensation and numbness affecting her right buttocks and leg radiating down into her right foot. Dr. Brown opined that her pain was consistent with the way Gorton described the accident occurring. He initially treated her with cortisone injections and medication and ordered an MRI which showed a herniated disc. Gorton was continuing to work for the OPSO. When she returned in April, Gorton informed the doctor that when she stood for long periods at work, she got low back pain which radiated to her buttocks and groin and down her leg. Since she was eager to keep working and did not want surgery, Dr. Brown performed a surgery with needle like instruments on June 6, 1995, and removed quite a bit of the disc which they hoped would relieve her pain. When she returned to Dr. Brown ten days later, she was still having back pain which he treated with a back support, cortisone and a muscle relaxant. He instructed her to stay off from work.
On July 6 Gorton was still hurting and not improving. Dr. Brown noted at that time that she had vascular problems in her right leg which were not related to the accident. She was hospitalized and tests showed she still has a disc irritating the nerve. The tests by another doctor on her blood vessels showed she did not need surgery for that. On August 8, 1995, Gorton had surgery (a decompressive laminectomy and discectomy over L4 and L5). In September although better, she was still having problems and numbness in her foot. Two weeks later she reported that the pain medication was not helping her pain. She was receiving daily physical therapy. Dr. Brown referred her to a pain management clinic. In October the pain was better and only in her leg. In November she had calf and thigh pain and pain from exertion along with frustration she was not well. In December she informed Dr. Brown she had resigned because she could not do her job.
At that time Dr. Brown concluded she was disabled from her job due to her vascular and remaining back problems. Dr. Brown determined Gorton had a 30% to 35% permanent partial anatomic disability of her whole body. Of that total, 20% was related to the back surgery due to the February 15, 1995 fall. He considered her 100% disabled. He did not believe there would be any improvement in her prognosis unless one of her conditions unrelated to the accident progressed.
In June 1996 Gorton sought a release from Dr. Brown to return to work at the OPSO. She was released to do sedentary office work with no prolonged standing, bending, twisting or lifting. Dr. Brown stated the foregoing restrictions were permanent. The doctor stated Gorton got occasional back aches that were not incapacitating. Although a physical therapist had concluded that Gorton could perform medium level work, Dr. Brown released her to do only sedentary work due to her pain symptoms. Dr. Brown stated her 20% disability was due to her February 15, 1995 fall. He stated she would "get along pretty well" as long as she did no twisting, bending, lifting or climbing. He stated if she did not change her lifestyle to avoid those activities, she was "in for pain." Dr. Brown related that the disc injury would limit her ability to work if she had to perform any of the restricted activities. Dr. Brown speculated that, as long as she performed sedentary work, "she'll be able to get to retirement age."
*112 This plaintiff had two surgical procedures, endured continuing pain as she tried medicine and physical therapy, and was left with a 20% permanent disability related to her fall. Her medical expenses were $36,927.24. She must permanently refrain from prolonged standing, twisting, bending, lifting or climbing in order to avoid pain. These restrictions have permanently changed her lifestyle and her ability to work. She continues to have back pain which she treats daily with Tylenol and occasionally with prescription pain medication. Following the accident, she worked daily in pain, although she adjusted her activities so that her job performance remained good. This plaintiff was highly motivated to work, but was discharged by Sheriff Cook who expressed concern about her working in her pain and possibly reinjuring herself. The record shows her pain and her physical limitations were caused by her fall on February 15, 1995. While generous, the $175,000 general damages award was not an abuse of the trial court's "much discretion" under the particular facts and circumstances of this case.
Second, the OPSO contended that the award of $250,170 for loss of future earnings and earning capacity was unjustified by the record. The sheriff contended that the trial court's award was unsubstantiated and that there was no testimony by an economist concerning her work limitations. Further, a number of Gorton's health problems were not related to the 1995 fall at OPCC. In Gorton's view, the trial court's award for lost wages and earning capacity was appropriate because no one would hire a 58 year old woman with a 20% disability. Among the trial court's considerations was that plaintiff would have been working in pain at any minimum wage job and that without the large award for lost future wages, plaintiff would have been entitled to a greatly increased future pain award.
Lost earning capacity is loss of a person's potential and is not necessarily determined by actual loss. To ascertain whether a personal injury plaintiff should recover for lost earning capacity, the trial court should consider whether and how much plaintiff's current condition disadvantages her in the work force. Among the factors to be considered are her physical condition before and after her injury, her age and life expectancy, the amount plaintiff would have earned had she not been injured, and the probability that she would have continued to earn wages for the balance of her life. Lost income awards are speculative and cannot be calculated with absolute certainty. Therefore, the trial court is given broad discretion in setting an award for lost earning capacity. However, there must be a factual basis in the record. Quinn v. Wal-Mart Stores, Inc., 34280 (La.App.2d Cir.12/6/00), 774 So.2d 1093, writ denied, XXXX-XXXX (La.3/9/01), 786 So.2d 735.
The plaintiff proved by a preponderance of the evidence that she sustained a 20% permanent disability of her entire body as a result of her fall at OPCC. The trial court arrived at the award for lost earning capacity by using the salary she was earning when she was discharged due to her disability and calculating the amount she would have earned had she worked until her 65th birthday on February 28, 2007. In making the award the trial court considered her age (57 at trial in May 1999), her education and experience, the disadvantage in the job market at which the 20% disability and associated physical restrictions put Gorton, and the probability she would have met her goal of working until her 65 birthday, which Dr. Brown speculated she could do if she avoided restricted activities.
The OPSO vigorously argues that Gorton should not recover for lost earning *113 capacity because she had not supported her claim with testimony of an economic or vocational expert.[3] Expert testimony is highly desirable, encouraged and helpful to the trial court in setting and to this court in reviewing awards. However, it does not take expert testimony for either the trial or the reviewing court to know that a permanently disabled woman in her late fifties with limited education and experience and with significant restrictions on her physical activities will be at a huge disadvantage with other employers sharing OPSO's concern with potential liability and increased insurance rates. The trial court was influenced by the OPSO's dismissal of Gorton due to concerns about the possibility of her reinjury and working in pain while acknowledging she did good work.
Acknowledging the trial court's great discretion and the speculative nature of this award, our review of the entire record has convinced us that the trial court abused that discretion in awarding $250,170 for lost earning capacity and lost future wages. While her physician surmised that with sedentary work, Gorton could work until her stated retirement goal of age 65, Gorton also had significant other health problems which were unrelated to the accident at OPCC which resulted in her 20% total disability. Gorton had 10% to 15% additional disability due to significant vascular disease, a history of heart attacks with bypass surgery, and foot problems unrelated to her fall. The conclusion that Gorton could work uninterrupted until her 65 birthday was unreasonable, given her medical history and the evidence in this record. Therefore, this court reduces the award for lost earning capacity by half to $125,085.

DECREE
For the foregoing reasons, the judgment of the trial court is amended in the following respects: Plaintiff is awarded special damages for her medical expenses of $36,927.24. Since the OPSO has previously paid that amount for her medical treatment, OPSO is given a credit, according to the stipulation of the parties, for that same amount.
Next, the plaintiff's award for past lost wages is amended and reduced from $26,060.24 to a total of $19,331.52.
Finally, the award for lost earning capacity and future wages is amended and reduced to $125,085.00.
In all other respects, the judgment is affirmed with all costs to be paid by the OPSO. The appellate costs are $116.00 The matter is remanded for the trial court to set the amount of trial and record preparation costs. La. R.S. 13:5112.
AMENDED, AND AS AMENDED, AFFIRMED. REMANDED.
NOTES
[1] The 1996 amendment added the requirement that the owner was liable only if it was shown that (1) he knew, or in the exercise of reasonable care, should have known of the defect which caused the damage, (2) that the exercise of reasonable care could have prevented the damage and (3) the owner failed to exercise reasonable care.
[2] Unfortunately, the OPSO apparently did not carry insurance for the OPCC as the Jefferson Parish Sheriff did in Grieff, supra for the office building.
[3] The fourth Circuit Court of Appeal requires expert testimony for such a recovery. See discussion in Jones v. Trailor, supra, in which medical testimony similar to that given in this case was not sufficient to support the trial court's award for lost earning capacity, absent expert testimony.