867 So.2d 884 (2004)
Linda JOHNSON, et vir., Plaintiff-Appellee,
v.
LSU MEDICAL CENTER, et al., Defendant-Appellant.
No. 38,204-CA.
Court of Appeal of Louisiana, Second Circuit.
March 3, 2004.
*885 Claude W. Bookter, Jr., Special Assistant Attorney General, for Appellant.
Sutton & Sutton, by Bobby D. Sutton, Sr., Shreveport, for Appellee.
Before GASKINS, CARAWAY and DREW, JJ.
GASKINS, J.
The defendant, Louisiana State University Medical Center (LSUMC), appeals that portion of the trial court judgment which awarded lost future wages and earning capacity to the plaintiff, Linda Johnson. For the following reasons, we affirm.

*886 FACTS
Mrs. Johnson was employed as the office manager for an ophthalmologist, Dr. Alan Richards. In late 2000 and early 2001, she developed a severe inflammation in her left eye that did not respond to treatment by Dr. Richards or Dr. Charles Lyon, another ophthalmologist practicing in the building. Dr. Richards referred Mrs. Johnson to Dr. James P. Ganley at LSUMC. In an attempt to treat her condition, Dr. Ganley injected a substance into Mrs. Johnson's eye. The substance was improperly injected beneath the retina and into the vitreous of the eye, causing the retina to detach. Realizing his error, Dr. Ganley contacted Dr. Lyon, who performed emergency surgery that afternoon. He was able to save the eye, but the damage to the retina was permanent and Mrs. Johnson lost the sight in that eye.
Mrs. Johnson claimed that she recuperated from the surgery for six weeks, while performing some work at home. She then returned to work for Dr. Richards for several months. She claimed that she had trouble keeping up with her duties.
A bookkeeping error on her part came to light that had been ongoing for some time prior her injury. Apparently Mrs. Johnson had been double-posting Medicaid payments to Dr. Richards' checking account for about two years. When the discrepancy was discovered, the account was overdrawn by $30,000 to $35,000. Also, Dr. Richards testified that Mrs. Johnson was not getting along with other members of the office staff. Dr. Richards demoted Mrs. Johnson and assigned her to work only part-time, without fringe benefits. Mrs. Johnson resigned, drew unemployment compensation for awhile, and later obtained part-time employment as a music librarian at her church.
In addition to the loss of vision in her eye, Mrs. Johnson suffered an aggravation of her fibromyalgia. She claimed that, as a result of her injury, she became depressed and required treatment and medication. She asserted that she is not able to work as she did before, that she is no longer as physically active, that she has sleep disturbances, and that she worries constantly about injury and loss of vision in her right eye.
A medical review panel was convened and determined that LSUMC did not deviate below the applicable standard of care. On April 9, 2002, Mrs. Johnson filed a petition for damages, claiming a permanent partial disability; lost earning capacity; lost employment capacity; loss of past, present and future wages; past, present, and future pain and suffering; and permanent emotional suffering. Her husband asserted a claim for loss of consortium.
On January 13, 2003, LSUMC entered a stipulation of liability, recognizing that Mrs. Johnson was given an injection for treatment of iritis that resulted in the loss of vision in the eye. LSUMC admitted that the standard of reasonable care was breached by failing to properly administer the injection and the breach was the sole and proximate cause of loss of vision in the left eye. The issue of the amount of damages remained contested.
Following a bench trial on February 24-25, 2003, the trial court made the following award of damages to Mrs. Johnson:

Past, present and future pain and
suffering $300,000.00
Past lost wages 2,400.00
Present and future lost wages and
earning capacity[1] 841,345.00
Medical expenses 45,892.05

*887 Mr. Johnson was awarded $30,000 for loss of consortium and expert witness fees were granted. The total award was subject to the statutory cap of $500,000 under La. R.S. 40:1299.42. LSUMC appealed.

LOST FUTURE WAGES AND EARNING CAPACITY
LSUMC claims that the trial court erred in awarding future lost wages and earning capacity to Mrs. Johnson. This argument is without merit.

Legal Principles
Lost earning capacity is loss of a person's potential and is not necessarily determined by actual loss. Gorton v. Ouachita Parish Police Jury, 35,432 (La. App.2d Cir.4/3/02), 814 So.2d 95, writs denied, XXXX-XXXX (La.8/30/02), 823 So.2d 950; XXXX-XXXX (La.8/30/02), 823 So.2d 952. The plaintiff need not be working or even in a certain profession to recover such an award. What is being compensated is the plaintiff's lost ability to earn a certain amount and she may recover such damages even though she may never have seen fit to take advantage of that capacity. Brandao v. Wal-Mart Stores, Inc., 35,368 (La.App.2d Cir.12/19/01), 803 So.2d 1039,
writ denied, XXXX-XXXX (La.3/9/01), 786 So.2d 735.
To ascertain whether a personal injury plaintiff should recover for lost earning capacity, the trial court should consider whether and how much the plaintiff's current condition disadvantages her in the work force. Among the factors to be considered are her physical condition before and after her injury, her age and life expectancy, the amount the plaintiff probably would have earned had she not been injured, and the probability that she would have continued to earn wages for the balance of her life. Lost income awards are speculative and cannot be calculated with absolute certainty. Therefore, the trial court is given broad discretion in setting an award for lost earning capacity. However, there must be a factual basis in the record. Gorton v. Ouachita Parish Police Jury, supra.
Credibility determinations, including the evaluation of expert testimony, are factual issues to be resolved by the trier of fact. Where the testimony conflicts, the fact finder's reasonable evaluation of credibility and reasonable inferences of fact should not be disturbed upon review, even where the appellate court may feel that its own evaluations and inferences are more reasonable than those of the jury. Quinn v. Wal-Mart Stores, Inc., 34,280 (La.App.2d Cir.12/6/00), 774 So.2d 1093.
An appellate court may not set aside a trial court's factual findings unless they are manifestly erroneous or clearly wrong. For reversal on appeal, the appellate court must find (1) a reasonable factual basis does not exist in the record for the factual findings of the trial court and (2) the record establishes that the factual findings are clearly wrong and manifestly erroneous. The appellate court must do more than look at the record for evidence which supports or discredits the trial court's findings. The reviewing court must review the entire record to determine whether the trial court's findings were clearly wrong or manifestly erroneous. In addition, the appellate court must decide if the trial court's conclusions were reasonable. *888 Even when the reviewing court may conclude that its own evaluations are more reasonable than the trial court's the appellate court should not substitute its judgment for that of the trial court. Lewis v. State, Department of Transportation and Development, 94-2370 (La.4/21/95), 654 So.2d 311; Gorton v. Ouachita Parish Police Jury, supra.

Evidence and Testimony
Greg F. Johnson, Mrs. Johnson's husband, testified that following the surgery to try to save the eye, his wife recuperated at home for approximately six weeks. Due to her eye surgery, Mrs. Johnson was not supposed to lift her head. She tried to work from home by putting a computer monitor on the floor. She was able to work for periods ranging from 15 minutes to one hour. Mr. Johnson carried materials back and forth for her.
According to Mr. Johnson, once his wife returned to work, she had trouble keeping up with her duties. She was asked to begin training another employee to take over some of her responsibilities. Eventually, she was demoted, her hours were cut to two days per week, and her fringe benefits were terminated. Mr. Johnson acknowledged that his wife's hours were cut due to a bookkeeping error on her part that occurred before her eye injury.
Mrs. Johnson testified that, as a result of the surgery, she now has a sponge behind her eye that must be kept lubricated. She still has pain in the eye and has fibromyalgia that was made worse by the stress and depression over the loss of vision in the eye.
Mrs. Johnson said that after returning to work following her injury, she had to use a larger computer screen and adjusted the level of the screen to eliminate glare. She stated that she was not able to keep up with her duties at work. She admitted that no physician has told her that she cannot work as an office manager.
Dr. Charles Lyon, Mrs. Johnson's treating eye physician, testified that she has a 23 percent disability of her body as a whole due to the loss of her eye.
Dr. Alan Richards testified that Mrs. Johnson worked in his medical office from 1994 until August 2001. He stated that after the injury to her eye and resulting surgery, Mrs. Johnson worked at home some while she recuperated. He stated that she had problems communicating with other employees that were exacerbated by her eye injury.
Dr. Richards stated that his decision to reduce Mrs. Johnson's hours was caused by a bookkeeping error of long duration that resulted in his office bank account being overdrawn by $35,000. He stated that he cut her hours back to two days per week on August 27, 2001, and she resigned on August 30, 2001.
Dr. Robert E. Goodman, a rheumatologist, testified by deposition that he began treating Mrs. Johnson in December 2000, about the time her eye inflammation began. She complained of pain in her legs and ankles, left knee, right hip, and low back. He was aware of her eye inflammation. Over the course of treatment, Dr. Goodman consulted with Dr. Richards and Dr. Lyon to rule out the possibility that the eye problem was connected with Mrs. Johnson's joint and muscle complaints. No connection was found.
Dr. Goodman continued to treat Mrs. Johnson through the loss of sight in her left eye. By April 30, 2001, Dr. Goodman determined that Mrs. Johnson had fibromyalgia. Dr. Goodman noted that he prescribed medication for depression for a period of time. Although Dr. Goodman never imposed any work restrictions on *889 Mrs. Johnson, he stated that if a patient is having eye problems, it can lead to depression and stress which exacerbate fibromyalgia.
Dr. Richard Galloway, an expert in vocational rehabilitation, testified on behalf of Mrs. Johnson. Dr. Galloway reviewed Mrs. Johnson's medical records and noted that she had been employed as the manager of a medical office. He found that upon her return to work after the injury, she had trouble doing her work. She did very little driving and doesn't drive at all at night. She no longer reads as much and does not do as much "close work." She now has problems with details; it is harder for her to judge distances and to perceive differences in color and in form. He opined that she could continue to do clerical work, but it would be slower and more laborious. Dr. Galloway testified that Mrs. Johnson would have trouble working an eight-hour day due to the loss of the sight in her eye, combined with her fibromyalgia. He stated that she would be able to work part-time. Dr. Galloway noted that the Americans with Disabilities Act might not be very helpful to Mrs. Johnson in gaining workplace accommodations because it only applies to businesses with 15 or more employees.
Dr. Galloway stated that Mrs. Johnson would have problems with work requiring visual acuity. He said that she would have to work harder and would make more mistakes. According to Dr. Galloway, a combination of the loss of vision, fibromyalgia, and the loss of a "well-paying job" was affecting Mrs. Johnson emotionally. Dr. Galloway testified that if Mrs. Johnson now had to question prospective employers about the physical requirements of a job to determine whether she can do the work, then she has sustained a loss of capacity to do jobs.
On cross-examination, Dr. Galloway stated that he was under the impression that Mrs. Johnson resigned her position with Dr. Richards because she was having trouble doing her work as efficiently as she had before the loss of vision in the eye. He was not aware that her hours had been reduced shortly before she resigned.
Janet Papworth, an expert in rehabilitation, testified on behalf of the defendants. She stated that she met for four hours with Mrs. Johnson and spent another 30 minutes talking with her on the telephone. Ms. Papworth stated that she considered Mrs. Johnson's injury as well as her extensive work history and concluded that Mrs. Johnson is self-imposed underemployed due to her concern about injuring her remaining eye.
Ms. Papworth noted that Mrs. Johnson has problems driving and is afraid that her retina will detach if she lifts more than 10 pounds. Ms. Papworth considered the possibility that Mrs. Johnson's eye problem may have worsened her fibromyalgia. She concluded that the loss of vision in Mrs. Johnson's left eye would not cause a loss of wage-earning capacity.
Dr. Melvin Harju testified concerning the lost wage analysis he conducted on Mrs. Johnson. He noted that the last full year that she worked for Dr. Richards, she earned $27,149. Dr. Harju then factored into his calculation Mrs. Johnson's present part-time wages at $8 per hour. He determined that, based upon her life-work expectancy of 17.3 years, without fringe benefits, her lost wages totaled $821,345. Although questioned about Mrs. Johnson's lost wages based upon her reduced wages and hours several days before her resignation, Dr. Harju stated that a proper calculation would more properly be based upon her earnings for the more than seven years she had been employed by Dr. Richards, *890 rather than what he paid her the last few days she worked there.

Discussion
In this matter, the trial court considered all the evidence and testimony, made credibility determinations, and concluded that Mrs. Johnson proved entitlement to damages for lost future wages and earning capacity.
The record shows that Mrs. Johnson returned to work at Dr. Richards' office for several months after her eye injury and received a good job evaluation during that time. However, there was also testimony that during that time, she had trouble keeping up with her work and was training a fellow employee to take over some of her responsibilities.
The record shows that Mrs. Johnson was demoted due to a bookkeeping error that occurred before her eye injury. However, the evidence also shows that due to the loss of vision in her eye, Mrs. Johnson was not able to function as effectively at clerical work as she did before the injury. Further, the loss of sight in her eye caused depression, aggravated her fibromyalgia, and caused difficulty in driving and other routine daily tasks. She was also constantly worried about loss of vision in her remaining eye.
While Mrs. Johnson's demotion and decision to leave her position with Dr. Richards may not have been attributable to the loss of vision in her eye, because of her injury, Mrs. Johnson has limitations that would make it virtually impossible for her to obtain similar employment and function on a full-time basis as effectively as she did before. Mrs. Johnson showed that her earning potential was damaged by this injury.
Simply stated, although Mrs. Johnson left her position with Dr. Richards for reasons unrelated to her eye, she was not functioning on the same level as she was before her injury. Also, as a result of the injury, she lost the capacity to work full time as a medical office manager.
The undisputed elements of damages in this matter total $348,292.05. Although the trial court awarded more than $800,000 for lost and future wages and earning capacity, we note that due to the $500,000 statutory maximum for medical malpractice claims, the plaintiff realistically only had to prove $151,707.95 in lost future wages and earning capacity. Based upon the record before us, we find that Mrs. Johnson carried her burden of proof in this regard.[2]

CONCLUSION
For the reasons stated above, we affirm the trial court's judgment granting to the plaintiff, Linda Johnson, damages for lost future wages and earning capacity.
AFFIRMED.
NOTES
[1] LSUMC points out the typographical error in this amount. Dr. Melvin Harju testified that the value of the present and future lost wages and earning capacity was $821,345. LSUMC contends that this error is inconsequential due to the statutory cap of $500,000.
[2] With the $500,000 statutory maximum for medical malpractice awards, in order to realistically reverse or amend the award, the defendant had to show that an award of $151,707.95 was not justified by the evidence in this matter. We pretermit any discussion of an award for lost future wages and earning capacity in excess of this amount.